**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | **FILED**<br>September 14, 2005 |
| | § | |
| | § | **CLERK, U.S. DISTRICT COURT** |
| **v.** | § | **Criminal Action No. 3:05-CR-087-R** |
| | § | |
| | § | |
| **DONALD RAY HALL** | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is defendant, Donald Ray Hall's motion to suppress, filed August 5, 2005, and the government's opposition to the motion, filed August 19, 2005. The Court held an evidentiary hearing on August 29, 2005. After reviewing the briefs submitted by counsel, examining the applicable law, observing the demeanor of witnesses at the hearing and judging their credibility in light of the evidence presented, the Court GRANTS defendant's motion for the following reasons.

## I. Background

On April 6, 2005, a federal grand jury indicted the defendant, Donald Ray Hall, for possessing with intent to distribute approximately 3.31 grams of a substance containing crack cocaine, a violation of 21 U.S.C. §§841(a)(1) & (b)(1)(C), and for knowingly possessing a firearm in furtherance of a drug trafficking crime, a violation of 18 U.S.C. §924(c)(1)(A).

The indictment arose from an incident that occurred on April 3, 2004. Both parties offer conflicting factual accounts of what actually occurred that day; however, the evidence submitted to the Court at the suppression hearing, including live testimony, establish the following.

1

On April 3, 2004, plainclothes officer Stanley Verbal of the Dallas Police Department (a three-year veteran of the plainclothes division) began observing the Robin Terrace Apartments after receiving complaints about illegal drug sales occurring at the complex. The Robin Terrace Apartments are located at 724 Ann Avenue, one block south of Interstate 30 in southeast Dallas. The highway lies on the property's northern edge, while Garland Avenue serves as its southern boundary. Ann Avenue and Carroll Street enclose the complex on the west and east, respectively. *See Govt.'s Ex. 1.*

The apartment complex is a small two-story "L"-shaped building. The apartment units face the interior quadrant created by the two sides of the structure, which also serves as the parking lot. *See Govt.'s Ex. 1, 3-9.* Breezeways span the length of the building on each floor, passing in front of the entrances to each unit. *Id.* The only other physical structure on the property is a smaller building that also serves as a wash room. *Id.* This structure is the same height as the main apartment building and is located inside the parking area near Carroll street, adjacent to the far side of the longer breezeways. *Id.*

At the evidentiary hearing, Officer Verbal testified that he arrived on scene between approximately 3:45 PM and 4 PM that afternoon and began monitoring the complex from the southeast, near the corner of Garland and Carroll. Officer Verbal watched the building for approximately 45 minutes while shuttling between his initial location at the intersection of Garland and Carroll, a nearby bus stop on Garland Road, and a small store located behind the complex on the I-30 frontage road.

During this surveillance, Officer Verbal saw four vehicles separately park alongside the building near the wash room. The visitors were greeted by a someone on a stairwell standing below.

2

In each of these instances, the visitors exited their vehicles, ascended the common stairwell, and approached Apartment 204 on the second story of the building.[1]  Officer Verbal saw these individuals enter the apartment and leave shortly thereafter, all of which stayed no longer than three minutes each.  Based on his training and experience, Officer Verbal suspected that drugs were being sold out of the apartment.

Officer Verbal then reported what he had seen to his fellow officers. At some point shortly thereafter, they decided to contact the next suspicious visitor, eventually identified as a young hispanic woman.  Officer Verbal and other officers decided to follow her as she exited the complex in a Suburban and onto the Interstate 30 freeway.  With the assistance of his fellow officers, Officer Verbal then stopped the vehicle on Interstate 30 for a traffic violation.  During this stop, Officer Verbal spoke to the woman.  He testified that she told him that she had just purchased crack cocaine in Apartment 204 but that she had "thrown it out the window"[2] when she saw the officers following her vehicle.  Officer Verbal testified that he and his fellow officers attempted to recover the contraband that the woman claimed to have discarded, but to no avail.[3]  No contraband was found in the vehicle, and the occupants were not arrested.

---

[1] Apartment 204 is located on the second story of the complex at the far end of the longer breezeway. Unlike most of the other units in the complex, the apartment is hidden behind the structure that houses the wash room.  The door to the apartment is located approximately ten inches from the protective railing that protects pedestrians on the breezeway from the second-story precipice.  The door to the apartment is hinged on the left side of the doorway and pivots inward when opened.  *See Govt.'s Ex.* 6, 8, 9; *Def.'s Ex.* 1.

[2] Audio tape: Hearing on Defendant's Motion to Suppress (August 29, 2005) (on file with Court).  The transcript of the hearing was unavailable at the time of this opinion.  All further testimony is quoted from this source.

[3] When asked about the discarded contraband on direct examination, Officer Verbal testified that there was "a big grassy slope off the freeway [at that location], and it would have impossible to find it."  He then stated that the officer did look, but did not find anything.

Officer Verbal then informed his supervisor, Sargent Martinez about his investigation. After speaking with him, Officer Verbal testified that he and the other officers concluded, "the best thing to do based on our experience at the complex was to load some officers up in the van – I had a minivan at the time– and drive up into the parking lot without using a police car so the officers could get out on foot and go up to the apartment and knock on the door." Officer Verbal then testified that he put on a police vest and approached the apartment with three uniformed officers.

The facts become disputed at this point. To facilitate the analysis, each parties' factual allegations are summarized below.

### A.    Government's Version of Events

Officer Verbal testified that, while still daylight outside, he and the other officers approached Apartment 204 only to find the door wide-open. When asked what he saw when he arrived at Apartment 204, Officer Verbal testified on direct examination, "The door was wide open, [I] poked my head in the door, and saw the defendant sitting at the table with packages based on my [training and experience I believed to be crack]."[4] The table was located inside the apartment, immediately to the left of the entrance. *See Govt.'s Ex.* 1; *Def.'s Ex.* 1. Officer Verbal also testified that he observed a handgun lying on the table in close proximity to the defendant and his companion.

Officer Verbal testified that the officers entered the apartment out of concern for their safety and to prevent the contraband from being destroyed. He testified that the officers proceeded to identify themselves as the police and ordered the men to raise their hands. Officer Verbal claims that the defendant hesitated before complying with his request and even glanced back and forth

---

[4] Officer Verbal's testimony is contradictory. He maintains that he was able to see the table from outside the doorway, but he first testified here that he saw the table when he "poked" his head inside the doorway.

between the officers and the gun as if contemplating something. Officer Verbal testified that he persuaded the defendant to comply by telling him, "It's not worth dying for." On cross-examination, he testified that he said this to the defendant while "leaning up against the door" and also with his service weapon pointed at him. The officers then placed the defendant and his companion under arrest. Officer Verbal also testified that the defendant spontaneously told the officers that the contraband on the table was his and that his companion "had nothing to do with this." While conducting a search incident to arrest, the officers found a key to the apartment in the defendant's pocket and a .22 caliber revolver in his companion's possession.

## B.    Defendant's Version of Events

The defendant's version of events differs entirely from Officer Verbal's testimony. The defendant testified that the door was not wide open when the officers approached but was also not completely shut. Rather, he testified that the door was only open slightly, "cracked" open about two to three inches wide.[5]

The defendant testified that moments before coming into contact with the officers, he and his companion were sitting at the kitchen table. The defendant was seated facing the direction of the doorway while his companion faced the opposite direction, toward the kitchen with his back to the door. The two then heard a loud commotion outside, and the defendant's companion approached the door to investigate. As his companion reached for the doorknob to open the door, the defendant

---

[5] The Court takes judicial notice that the infinitive "to crack" is often used colloquially in American English to mean "to open slightly." WEBSTER'S NEW COLLEGIATE DICTIONARY 262 (1979); Merriam-Webster Online Dictionary, http://www.m-w.com (last visited Sept. 7, 2005); *see, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 37 (2001) ("[T]here is certainly no exception to the warrant requirement for the officer who barely *cracks open* the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.") (emphasis added) (Scalia, J.).

5

testified that the officers barged into the apartment.  The defendant testified that his friend was then thrown to the ground and placed under arrest.  The defendant also testified that he was placed under arrest without incident.  He specifically denied glancing at the gun in contemplation or having any conversation with Officer Verbal.  The defendant also testified that he was not aware that the officers were present at the complex before they entered the apartment.

The defendant testified that when the officers stood outside the apartment, the door was only cracked.  Additionally, the defendant testified that the door could not have possibly been "wide-open" as Officer Verbal alleges since the door will close by itself to a certain point approximately midway through its arc.  *See also, Def.'s Ex.* 1 (video exhibit).  Defendant's video exhibit also shows that even when the door is halfway open at a 90-degree angle, it is impossible to see the kitchen table from the best vantage point to the right of the doorway and to the left of the protective railing. *See id*.  The defendant also testified that the door's position in the video best approximated the door's normal resting position, the point to where the door would eventually close had it been fully opened.

### C.     The Court's Factual Findings

For the reasons stated below, the Court finds the defendant to be more credible than Officer Verbal on all facts in dispute.  The defendant's demeanor and composure was more credible than Officer Verbal's throughout the hearing.  In addition, the Court found the defendant's testimony to be more consistent and forthright than Officer Verbal's testimony.  The Court also found Officer Verbal's factual account to be embellished at times, especially with respect to the defendant's reaction when the police entered the apartment.

The Court found Officer Verbal's testimony to be more much more deliberate and cautious, and hence less credible.  At one point during the hearing, Officer Verbal appeared to alter his testimony for no apparent reason other than to avoid overturning the search.  The situation arose when Officer Verbal finished recounting entire chronology of the investigation before he approached Apartment 204 for the knock and talk. Officer Verbal was then asked whether he believed that he had probable cause for a search warrant after observing the five different visitors to the complex and obtaining the declaration against penal interest from this hispanic woman he stopped on interstate 30.  He responded to the question with a confident, resounding "Yes, ma'am."  Only after being asked a series of leading, rehabilitative questions by the AUSA did he finally change his testimony on that very same question to "no," the response in accord with the government's litigating position.[6]  Defense counsel took advantage of this switch in testimony on cross examination by having Officer Verbal admit that he could not excuse himself from the warrant requirement based on fear that evidence would be destroyed in the interim, since his new testimony was now that he was not certain that drugs were in the apartment.

By contrast, the defendant appeared to be forthcoming about the truth and unconcerned about incriminating himself any further.  During his cross-examination, the defendant was asked whether he believed that he committed any wrongdoing by possessing the firearm and the crack cocaine.  His counsel loudly objected on Fifth Amendment grounds, but the defendant did not hesitate to admit

---

[6] As explained *infra*, whether an officer has probable cause for a search warrant is crucial in determining the propriety of a knock and talk investigation since it often determines whether the officers manufactured any exigent circumstances that may arise from that contact.

his wrongdoing.[7]   In fact, even Officer Verbal lauded the defendant candor when he took responsibility for the items found in the apartment when he was arrested.

The Court also finds defendant's factual account to be more credible than Officer Verbal's testimony in light of the evidence presented at the hearing. Therefore, the Court finds that the door of the apartment was not wide open as the government contends.  Officer Verbal testified that government's photograph, exhibit No. 11, fairly and accurately depicts how he saw Apartment 204 when he approached for the knock and talk.  Yet, defense counsel correctly noted at the hearing that the picture depicts a person's arm grabbing the door at the hinge and holding the door in that position.[8]  *See Govt.'s Ex.* 11.  The defense contends and the defendant testified that the door cannot stay open in that position on its own, but it is not apparent from the defendant's video exhibit.  *Cf. Def.'s Ex.* 1.

Regardless of whether the door is able to stay open on its own, the Court finds other reasons to believe that the door was only partially open as the defendant contends.  Officer Verbal's own choice of words at the hearing suggests that the door was only partially open.  Officer Verbal testified that once he arrived at the doorway he "poked" his head through the doorway to see inside and "leaned" against the doorframe while speaking to the defendant.  This testimony clearly contradicts his earlier testimony that the door was wide open and revealed the kitchen table to anyone standing outside.  The Court does not understand why it would have been necessary for

---

[7] For example, on cross examination, the prosecution asked, "Mr. Hall, isn't it true that you didn't want to get caught with the drugs?," and the defendant replied, "Yes."  He was then asked shortly thereafter, "And had you the opportunity to hide the drugs, would you have done it?," to which he responded "Probably."

[8] The Court commends the United States Attorney's Office for presenting Exhibit 11 in such a truthful and ethical manner.  *Accord*, ABA Standards for Criminal Justice 3-1.2(c) (3d ed. 1993) ("The duty of the prosecutor is to seek justice, not merely to convict."); ABA Standards for Criminal Justice 3-5.6(a) (3d ed. 1993) ("A prosecutor should not knowingly offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses...").

Officer Verbal to have "leaned" against the doorframe and "poked" his head inside the apartment, unless there was something obstructing his view of the table -- most likely the door.  This word choice also corroborates his claim that the officers did not see the kitchen table through the small opening at the hinge.

Lastly, Officer Verbal did not mention during his testimony when he unholstered his service weapon.  His testimony transitions from approaching the apartment and seeing the gun and drugs in plain view on direct examination, to speaking with the defendant as he leaned against the doorway with his weapon drawn during cross examination.  This is significant since it suggests that Officer Verbal may have had his weapon drawn the entire time that he approached the apartment.  This is all the more likely when one considers his testimony as to how they wanted to conduct the search in a covert manner.

The evidence submitted by both parties shows that if the door were slightly opened, only the living room to the right of the door would be exposed to the public and not the kitchen table on the left where the defendant was seated.  *See Govt.'s Ex.* 1, 10; *Def.'s Ex.* 1.  As the defendant's video exhibit demonstrates, even if the door were opened halfway, it would have been impossible for anyone to seen the kitchen table without physically breaking the hold of the doorway, especially since there is limited line of sight created by the large, impassable metal railing located inches from the right of the doorframe.  *See Def.'s Ex.* 1; *Govt.'s Ex.* 9.

Accordingly, the Court credits the defendant's testimony and finds that the apartment door was only slightly open and that the officers could not have seen the table from outside the doorway.

## II. Analysis:

### A.     Standing

Before proceeding to the merits of the defendant's claim, the Court must first determine whether he has standing to challenge the search of his mother's apartment. The defendant argues, both in his motion and at the hearing, that he has standing because of his close relation to his mother and the virtually unlimited access that she has given him to her apartment. *See, e.g., Def.'s Mot.* at 3. The government did not respond to this claim in its written response or at the hearing. Instead, it chose to argue the merits of the Fourth Amendment claim.

In order for a defendant to have standing to challenge a search on Fourth Amendment grounds, he or she must have a "legitimate expectation of privacy" in the area searched. *Minnesota v. Olson*, 495 U.S. 91, 95 (1990) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). This is because Fourth Amendment rights are personal and cannot be asserted vicariously. *United States v. Padilla*, 508 U.S. 77, 81 (1993) ("a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure.").

To show a legitimate expectation of privacy, the defendant must show that he or she has a subjective expectation of privacy in the area searched and that society recognizes this expectation of privacy to be reasonable. *Olson*, 495 U.S. at 95-96. While it is not necessary for one to have an ownership or possessory interest in the premises to have standing under the Fourth Amendment, one's mere presence on the premises by invitation or otherwise does not, by itself, create a legitimate expectation of privacy. *See Rakas*, 439 U.S. at 142-43; *United States v. Meyer*, 656 F.2d 979, 981 (5th Cir. 1981). One must show something more socially-significant than mere legitimate presence.

In *Rakas v. Illinois*, 439 U.S. at 141, the Supreme Court clarified its prior holding in *Jones v. United States*, 362 U.S. 257 (1960), in which it found that a defendant had standing to challenge

the search of a friend's apartment.  The Court explained that, although based on faulty reasoning, the result in *Jones* was correct since defendant had a legitimate expectation of privacy in his friend's apartment.  Not only did the defendant's friend permit him to use his apartment as he pleased, the defendant had been left alone on the premises for several days, was given a key, and even kept a few personal belongings at the apartment.  *See Rakas*, 439 U.S. at 141 (explaining *Jones v. United States*, 362 U.S. at 259).  The Court found those facts to be sufficient to conclude that Jones had a legitimate expectation of privacy in the apartment for proper standing.  "Jones not only had permission to use the apartment… but had a key… and kept possessions [inside]. Except with respect to his friend, Jones had complete dominion and control over the apartment and could exclude others from it."  *Rakas*, 439 U.S. at 149.

In cases like this one, where a defendant alleges standing in the residence of another, the relationship between the defendant and the owner of the premises searched may also be relevant to judging the reasonableness of the defendant's subjective expectation of privacy.  For instance, in *Minnesota v. Olson, supra*, the Supreme Court recognized that an overnight house guest has a legitimate expectation of privacy in his host's home.  In arriving at this conclusion, the Court reasoned that its decision "merely recognize[d] the everyday expectations of privacy that we all share... [since] [s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society."  *Olson*, 495 U.S. at 98.  Similarly, the District of Columbia court of appeals held in *Rose v. United States*, 629 A.2d 526, 531 (D.C. 1993), that the defendant's kinship with the owners of an apartment was relevant to whether he could claim a legitimate expectation of privacy in the apartment.  Although the defendant in *Rose* could not show that he was an overnight guest in his aunt and uncle's apartment, his close kinship, his weekly visits,

and his having been given a key to their apartment provided sufficient evidence for the court to find that he had a reasonable expectation of privacy at their apartment. *Id.*

At the evidentiary hearing, the defendant testified that his mother owned the apartment and had given him a key to come and go as he pleased. This key is the same key that was found in his front pocket when he was arrested. He testified that he visits his mother's apartment regularly, has a few personal belongings there, and slept over "every now and then." One may also infer from the defendant's testimony that his mother gave him a key to the premises that she also granted him permission to be in the apartment without her supervision and the right to possess and control the premises when she was not there.

In light of this testimony, the Court finds that there is ample evidence to conclude that the defendant has standing to challenge the search of his mother's apartment. The defendant was closely related to the owner of the apartment (his mother). He had open permission to use the apartment as he pleased. He was given his own key and was permitted to be at the apartment while unsupervised, much like on the day of his arrest. He kept some personal possessions at the apartment, made regular visits to the apartment, and sometimes spent the night. When at the apartment unsupervised, the defendant exercised complete dominion and control over the premises including the power to exclude others. All of these facts, *taken together*, provide more than enough evidence for the Court to conclude that the defendant enjoyed a legitimate expectation of privacy in the apartment. *Cf. Rakas*, 439 U.S. at 141, 149; *Olson*, 495 U.S. at 98.

Lastly, the defendant is still able to show that he had a legitimate expectation of privacy, despite being engaged in the commercial activity of bagging and selling drugs at the time of the search. *Cf. Minnesota v. Carter*, 525 U.S. 83, 91 (1998) (defendants had no reasonable expectation

12

of privacy while bagging cocaine in the home of another because of "the purely commercial nature of the transaction…, the relatively short period of time on the premises, and the lack of any previous connection [with] the householder.").  Unlike the defendants in *Carter*, the defendant's prior use of the apartment was not entirely commercial and he has a significant prior relationship with the apartment owner (his mother).  Even considering the defendant's illicit commercial activity, the Court finds that *Carter* is distinguishable and that there is more than enough evidence to conclude that the defendant had a legitimate expectation of privacy in his mother's apartment.  Therefore, the Court finds under these facts that the defendant has standing to challenge the search, regardless of his illicit activity at the apartment.

### B.    Warrantless searches are presumptively unreasonable.

The Fourth Amendment provides that "[t]he right of the people to be secure ... against unreasonable searches and seizures[ ] shall not be violated...."  *U.S. Const. Amend. IV*.  This right is generally preserved, both in text and history, by the warrant requirement.  As the Supreme Court has explained, "The primary reason for the warrant requirement is to interpose a 'neutral and detached magistrate' between the citizen and 'the officer engaged in the often competitive enterprise of ferreting out crime.'" *United States v. Karo*, 468 U.S. 705, 717 (1984) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

For that reason, warrantless searches are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).  The burden of proof is on the government to show that a warrantless search or seizure is constitutional.  *See United States v. Berick*, 710 F.2d 1035, 1037 (5th Cir.), *cert. denied*, 464 U.S. 918 (1983) (citing *Vale v. Louisiana*, 399 U.S. 30 (1969)).

Although "the Fourth Amendment protects people, not places," *Katz v. United States*, 389

U.S. 347, 351 (1967), "the protection [that] the Fourth Amendment affords to [] people... [g]enerally

requires reference to a 'place.'" *Katz*, 389 U.S. at 361 (Harlan J., concurring).  In this regard, the

"Fourth Amendment draw[s] a firm line at the entrance to the house." *Payton*, 445 U.S. at 590; *see*

*also, Kirkpatrick v. Butler*, 870 F.2d 276, 281 (5th Cir.1989).  This is because "physical entry of the

home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton*, 445

U.S. at 585 (quotation omitted).  Since, unlike other areas, the interior of a home or a residence is

protected by the Fourth Amendment,[9] the Supreme Court has recognized that any physical invasion

of the structure of the home by police officers, "by even a fraction of an inch," is too much.  *Kyllo*

*v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512

(1961)).

### C.       Exceptions to the Warrant Requirement:

There are, however, two important exceptions to the warrant requirement: consensual

searches and searches made under exigent circumstances supported by probable cause.   "A

warrantless intrusion into an individual's home is presumptively unreasonable unless the person

consents [to the intrusion] or [both] probable cause and exigent circumstances justify the

encroachment." *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001) (citing *Steagald v. United*

*States*, 451 U.S. 204, 211 (1981); *Payton*, 445 U.S. at 586; *United States v. Vega*, 221 F.3d 789, 798

---

[9] *Compare  Karo*, 468 U.S. at 714 ("At the risk of belaboring the obvious, private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable."); *United States v. Kyllo*, 533 U.S. 27, 37 (2001) ("In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.") (opinion by Scalia J.), *with United States v. Santana*,  427 U.S. 38, 42 (1976) ("What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.") (quoting *Katz*, 389 U.S. at 351).

(5th Cir. 2000)); *see also, Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("As *Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.") (per curiam).

Here, neither the evidence presented nor the parties' briefs suggest that the defendant consented to the officers' entry into the apartment. Officer Verbal even testified that he never asked the defendant for consent to search. Consequently, it is the government's burden to prove both probable cause and exigent circumstances to show that their warrantless entry into the defendant's apartment was constitutional. When proving exigent circumstances, the government must also show that the officers did not create or "manufacture" the exigency. *See Jones,* 239 F.3d at 719 ("[t]he exigencies supporting a warrantless search may not… 'consist of the likely consequences of the government's own actions or inaction.'") (quoting *Vega*, 221 F.3d at 799); *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir. 1983); *United States v. Rico*, 51 F.3d 495, 502 (5th Cir. 1995) ("Just as exigent circumstances are an exception to the warrant requirement, a police-manufactured exigency is an exception to the exception.").

### 1.    Probable Cause

To show that a warrantless search was constitutional, the government must prove that it had probable cause to search at the time of the warrantless entry. Probable cause exists when under "the totality of the circumstances... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Here, the government claims that the officers had probable cause to search since they saw the defendant and his friend packaging small white rocks into plastic bags in plain view. *Govt.'s*

*Resp.* at 2.   The government contends that the criminality of this activity was "immediately apparent" to the officers based on their training an experience.   *Id.*

Although it is true that "[i]ncontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause," *Horton v. California*, 496 U.S. 128, 137 n.7 (1990), the government's argument presumes a factual scenario that the Court does not believe occured.[10]

The Court has already concluded that the officers did not see and could not have seen the kitchen table before they entered.   Therefore, the Court must determine whether probable cause existed before the officers approached apartment 204 to conduct the knock and talk.   The government contends that officers decided to conduct the knock and talk investigation because they did not believe that they had probable cause for a warrant before approaching the apartment.[11]   *See Govt.'s Resp.* at 2.

However, this argument has no bearing on the Court's ultimate inquiry.   Whether officers believe that they have probable cause is irrelevant to whether they actually had probable cause. Courts are to decide issues of probable cause on an objective basis, without regard to law enforcement's subjective beliefs, whatever those beliefs may be.   *See, e.g., Whren v. United States*,

---

[10] The Court notes that even if door were open-- which it was not -- the mere sight contraband would only establish the probable cause necessary for a search warrant.  By itself, it would not privilege the police to conduct a warrantless entry.  *See, e.g., United States v. Munoz-Guerra*, 788 F.2d 295 (5th Cir. 1986); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (police may seize contraband in plain view only if (1) they "are lawfully in the position from which they view [it]," (2) if "its incriminating character is immediately apparent," and (3) the officers "have a lawful right to access [it]."). In that situation, the government would have to prove an independent justification for the entry, like exigent circumstances.  *See infra*.

[11] As mentioned previously, Officer Verbal initially testified that he believed that he had probable cause to search before conducting the knock and talk.  He then changed his testimony and claimed that he did not believe that he had probable cause once it became apparent that his initial testimony did not match what the government's attorney wished to prove.  For that reason, the Court finds that his initial response to the question – stating that he believed that he had probable cause before conducting the knock and talk – is probably the truth.

517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Clark*, 559 F.2d 420, 425 (5th Cir.) ("[E]ven though a police officer believed that probable cause was lacking, the Court still had the duty to objectively determine if probable cause was present."), *cert. denied*, 434 U.S. 969 (1977); *United States v. Resnick*, 455 F.2d 1127, 1132 (5th Cir. 1972), *modified*, 459 F.2d 1390 (5th Cir. 1972) ("the scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer"); *see also Horton v. California*, 496 U.S. 128, 138 ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer."). Consequently, the Court is unconcerned with the officers' subjective appraisals of probable cause for purposes of determining whether probable cause exists.

The law generally recognizes that an anonymous tip is insufficient to establish probable cause for a search warrant since it does not demonstrate the basis of the informant's knowledge, his or her veracity, or the tip's overall reliability. *See Gates*, 462 U.S. at 238. However, if the details provided in an anonymous or otherwise unreliable tip are independently corroborated by the police through their own independent investigation, then those observations may bolster the tip's overall reliability so much as to establish probable cause. *See id.* at 242-44 (finding that corroboration of innocent facts rendered an anonymous tip reliable enough to establish probable cause for a search warrant). Moreover, there is no requirement that the conduct observed be independently illegal or unlawful since "seemingly innocent activity [may] [become] suspicious in light of [an] initial tip." *Id.* at 243-44 n.13.

17

In rare occasions, a tipster's information may be exceptionally reliable by virtue of the testimony itself.  The best example of this is a statement against penal interest, which the Supreme Court has recognized to be exceptionally reliable in determining probable cause to search.  As the Supreme Court has explained:

> People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility--sufficient at least to support finding of probable cause to search. That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct.

*United States v. Harris*, 403 U.S. 573, 583 (1971); *see also, United States v. Roberts*, 747 F.2d 537, 544 (9th Cir.1984).

In *United States v. Jones, supra,* the Fifth Circuit confronted a case that was remarkably (or disturbingly) similar to this case.  The case involved yet another Dallas police officer who also received complaints of drug activity occurring at an another apartment complex in southeast Dallas. When the DPD officers arrived on scene, they encountered a woman who was leaving the apartment complex.  The woman told the officers that she had gone to the apartment that they were investigating to buy drugs.  *Jones*, 239 F.2d at 718-19.  Again, believing that they did not have enough evidence to obtain a search warrant, the officers decided to conduct a "knock and talk" at the apartment to ascertain the occupants' identities and to ask for consent to search.  *Id.* at 720.

On those facts, the district court found that the reports of illegal activity and the woman's statement against penal interest were jointly sufficient to establish probable cause that drugs were in the apartment.  *See* Id. at 719 n.2.  On appeal of the district court's order denying the motion, the Fifth Circuit chose not to disturb the lower court's probable cause finding since the defendant did not specifically challenge it.  *See id*.

18

Although the Fifth Circuit did not rule on the merits of district court's probable cause finding in *Jones*, the case provides a remarkably similar baseline against which this Court may determine whether Officer Verbal and his associates had probable cause to search.  Comparing Officer Verbal's investigation against the investigation in the *Jones* opinion, the Court concludes that Officer Verbal had even stronger basis for probable cause in this case than the officers in *Jones*, who were also found by the district court to have probable cause.

The officers in *Jones* had probable cause to search based on nothing more than community complaints of drug sales and a mere declaration against penal interest that identified the apartment as the source of drug sales.  Much like the officers in *Jones*, Officer Verbal received community complaints of drug activity and obtained an unprovoked declaration against penal interest that identified an apartment as the source of drug sales.  *Cf. Jones*, 239 F.2d at 719 n.2.  But unlike the officers found to have probable cause in *Jones*, Officer Verbal also observed numerous individuals engage in suspicious activity involving Apartment 204.  He saw numerous individuals suspiciously arrive at the complex, be greeted in the same manner by people standing near the stairwell, and directed to Apartment 204.  The visitors would enter apartment 204 only to leave a short time later.  To the untrained eye, these observations may have been nothing more than innocent conduct.  But in this case, given the community complaints of drug sales and Officer Verbal's training and experience in drug interdiction, the observations were probative of the suspected illicit commercial activity.

Under the totality of the circumstances, these facts and their cumulative impact demonstrate "a fair probability" that contraband could be found in Apartment 204.  *Cf. Gates*, 462 U.S. at 238.

Accordingly, the Court finds that Officer Verbal and the DPD had probable cause to search the apartment *even before* they approached the apartment to conduct the knock and talk.

Given that the DPD officers in this case faced a strikingly similar factual scenario to the DPD officers in the *Jones* case, one wonders how they could have mistakenly concluded that they did not have sufficient probable cause for a warrant.[12]  The Court suspects that this is because the officers were aware that exigent circumstances arising from an unreasonably superfluous knock and talk investigation -- i.e., a knock and talk conducted *after* the officers already have more than enough probable cause for a search warrant -- would probably be found to have been impermissibly manufactured.

## 2.    Exigent Circumstances

Apart from probable cause, the government must also prove exigent circumstances to justify a warrantless search.  The following situations have been recognized as exigent circumstances that may justify a warrantless intrusion into a residence: the hot pursuit of a suspect, the possibility that evidence will be removed or destroyed, and immediate safety risks to the police and the general public.  *Jones*, 239 F.3d at 720 (citing *Richard*, 994 F.2d at 248); *see also*, *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) (hot pursuit); *Schmerber v. California*, 384 U.S. 757, 761-77 (1966) (destruction of evidence); *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967) (safety concerns to officers and public).

The government asks the Court to find exigent circumstances on two theories.  First, the government argues that exigent circumstances arose from the officers' concern for their safety when

---

[12] As explained *infra*, whether an officer believes he or she has sufficient probable cause also affects the whether the officer impermissibly manufactured exigent circumstances by conducting a "knock and talk."

they saw a handgun atop the table where the defendant and the other individual were packaging crack cocaine.  The government contends that once the officers stepped in front of the defendant's doorway, the defendant "was aware of [the officers'] presence" and their safety was placed into peril since the handgun was within the occupants' reach.  *See Govt.'s Resp*. at 4 n.5.  For that reason, the government asks the Court to find that the officers were privileged to enter the apartment to secure the firearm.  *Id*.  Second, the government argues that once the defendant and his companion became aware of the officers' presence another exigency arose that permitted them to enter the apartment to prevent the contraband from being destroyed.  *Id*.

Once again the government's arguments for exigent circumstances presume a factual scenario that the Court determines never occurred.  For the reasons stated previously, the Court does not believe Officer Verbal's testimony that the apartment door was wide open and instead finds that the door was only slightly open as the defendant testified.  Under the facts as found by the Court, there would have been no way for the police to have seen the kitchen table from outside the apartment.[13]

The only way that Officer Verbal could have seen the table when the door was slightly open is to have "poked" his head inside or blatantly pushed the door open, both of which would have been impermissible warrantless in the absence of a supervening exigency.  Therefore, the Court does not

---

[13] If the Court were to indulge the government's version of events purely for argument's sake, it would probably find that exigent circumstances existed under *Jones*, which held that the presence of a firearm near anyone suspected of drug activity presents "an obvious safety risk to law enforcement."  *See Jones*, 239 F.2d at 720.  The *Jones* opinion seems to make the suspect's *awareness* of the officers' presence irrelevant in the presence of both drugs and firearms; the court even permitted the defendant's awareness, and hence the exigency, to arise from the initial "knock" of the "knock and talk."  *See id*. ("Once Officer Ruff stood before the screen door and knocked, the residents were cognizant of the officers' presence.").  But this does not mean that the resulting search should always be upheld when that safety exigency is found.  The search may nevertheless be improper if the court were to find that the exigency was "manufactured" by the police, as explained *infra*.  In *Jones*, the search was ultimately held to be proper, not because the court found exigent circumstances to exist, but because it found that the exigency was not manufactured by the officer in conducting the knock and talk.  *See id*. at 721.

find that exigent circumstances arose as alleged by the government and concludes.  It also concludes

that there no other supervening exigency that could have permitted the officers to enter the

apartment without a warrant.

### 3.        Manufactured Exigency

As a final matter, even if the Court were to indulge the government's version of the facts as

true (which it does not) and were to find that exigent circumstances existed, the search would still

have been invalid since the Dallas police would have impermissibly "manufactured" the exigencies

by approaching Apartment 204 to conduct an unreasonable "knock and talk" investigation when they

had far more than enough evidence to be establish probable cause and had ample time to procure a

search warrant but did not.

"It is well settled that exigencies deliberately manufactured by the Government violate the

Fourth Amendment, especially if the Government's actions are intentionally taken to avoid the

warrant requirement."  *Howard*, 106 F.3d at 78 (citations omitted).  Exigencies may also be

"manufactured" in the absence of evidence suggesting bad faith or intentional subversion of the

warrant requirement.  *See also*, *Rico*, 51 F.3d at 502 (finding that bad faith was not required since

"[e]xigencies can be manufactured guilelessly or ulteriorly").

In determining whether an officer has impermissibly manufactured exigent circumstances,

one must determine "first whether the officers deliberately created the exigent circumstances with

the bad faith intent to avoid the warrant requirement, and second, even if they did not do so in bad

faith, whether their actions creating the exigency were sufficiently unreasonable or improper as to

preclude dispensation with the warrant requirement."  *United States v. Gould*, 364 F.3d 578, 590

(5th Cir. 2004) (per curiam).

Relevant to the latter inquiry is "whether agents could have obtained a search warrant prior to the development of the exigent circumstances upon which they relied." *Rico*, 51 F.3d at 502.  If the Court finds that there was not enough time for the officers to obtain a warrant before the exigency arose, the next question to consider is "whether the agents themselves... created the urgent situation by [using] unreasonable law enforcement tactics." *Id.* at 503.  To this end, "[one] must consider not only the motivation of the police...but also the reasonableness and propriety of the investigative tactics that generated the exigency." *Id.* (citations and internal quotation omitted).

Under the version of facts as alleged by the government, the Court would not be confronted with any evidence that Officer Verbal and the DPD acted in bad faith and deliberately sought to avoid the warrant requirement.  Therefore, the Court would have to determine whether the "knock and talk" investigation was "sufficiently unreasonable or improper as to preclude dispensation with the warrant requirement."  *See Gould, supra*.  In order to determine whether a knock and talk investigation was a reasonable investigatory tactic where the exigencies arise from the knock and talk itself, one must ask whether the investigating officers were fully aware that they already had probable cause before approaching the residence or were aware of other circumstances that would make the knock and talk unreasonable.  The Fifth Circuit in *Jones* held that a knock and talk is a "reasonable investigative tool… when officers reasonably suspect criminal activity," *see Jones* 239 F.3d at 720, but later ruled that it would be an unreasonable tactic if the police were to have conducted the knock and talk "convinced that criminal activity was taking place" or "[had] reason to believe that the suspect was armed," *id*. at 271 .

When officers, who have sufficient probable cause for a search warrant and ample time to procure a search warrant without compromising the investigation or their safety, approach the targets

of their investigation without justification, it is more likely that any exigencies arising from that contact will be found to have been "manufactured." *Compare, United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986) (finding that exigency was manufactured by police when they contacted the suspects of a home through a knock and talk despite having seen drugs in plain view inside from back window); *United States v. Richard*, 994 F.2d 244 (5th Cir. 1993) (officers created exigency when, despite having probable cause for a search warrant, they confronted a suspect at his motel room and forcibly entered when they heard drawers slamming inside); *United States v. Mercadel*, 226 F.Supp.2d 810, 817 (E.D. La. 2002) (where officer had sufficient probable cause for search warrant after seeing drugs in plain view, court held that "any exigency created by [the officer's] knock on the door and confrontation with the defendant was manufactured... and could have been avoided"); *with Jones*, 239 F.3d at 721 (exigency not manufactured by police during knock and talk since they "were not convinced that criminal activity was taking place and did not have reason to believe that the suspect was armed.").

These cases essentially recognize that at some point during an investigation, a "knock and talk" investigation is no longer necessary to establish probable cause for a warrant and, hence, its use becomes unreasonable. In the words of the court in *Jones*, once the police "are certain that the occupants [are] involved in criminal activity, a reasonable 'knock and talk' investigation [becomes] nugatory." *Jones*, 239 F.3d at 721.

That is not to say that exigencies arising from a knock and talk become "manufactured" when the officers conducting the investigation are later determined to have had sufficient probable cause to search prior to approaching the apartment. Rather, when determining whether a "knock and talk" is a reasonable investigatory tactic, the Fifth Circuit has suggested that the courts should

determine whether the police were convinced or should have been convinced that they had sufficient probable cause for a search warrant or had reason to believe that the suspects were in fact armed and dangerous.[14]  *See Jones* 239 F.3d at 721 ("Because the officers were not convinced that criminal activity was taking place and did not have any reason to believe that the occupants were armed, the 'knock and talk' procedure was a reasonable investigatory tactic under the circumstances."). Otherwise, the knock and talk becomes an unusual and unnecessary procedure and any exigencies arising from such investigations should be found to be "manufactured."

Moreover, in holding that the DPD did not manufacture the exigency like the officers in *Munoz-Guerra*, the *Jones* court found it significant that "the [DPD] officers... *did not observe any criminal activity* before approaching Jones' [*sic*] apartment that would nullify the purpose of a 'knock and talk' investigation."  *Jones*, 239 F.3d at 721 (distinguishing *Munoz-Guerra*).  This case presents the opposite situation, one that the *Jones* court would have disfavored.  Unlike the officers in Jones, Officer Verbal and his fellow officers did observe plenty of criminal activity before approaching the apartment – five different suspicious transactions over a span of 45 minutes, all of which corroborated initial complaints of drug activity (based on their training and experience) and were also found to be supported by a declaration against penal interest.    Officer Verbal and the DPD could not reasonably believe that they did not have sufficient probable cause for a search

---

[14] The court in *Jones* suggests that where police have "corroborated information that... suspects are armed and involved in drug trafficking," *Jones*, 239 F.3d at 721 n.13,  any exigencies arising from a "knock and talk" will be deemed to be manufactured like in *United States v. Vega*, even if the officers never "[have] seen any signs that... [the suspects] possess[] any drugs, money, or weapons."  *Id.* (quoting *Vega*, 221 F.3d at 794).  Surely Officer Verbal or another officer asked the young woman during the traffic stop whether the occupants of Apartment 204 were armed or had drugs in plain view, especially considering that they decided to conduct the "knock and talk" shortly after speaking with her.  If, in fact, they did know that the occupants were armed, the knock and talk would have been an unreasonable investigatory tactic and any exigencies arising from their warrantless entry would have been impermissibly manufactured.  However, because there was no such testimony at the hearing, the Court will not construe the absence of such testimony against either party.

warrant.  This Court has already found, *supra*, that the officers did in fact have sufficient probable

cause for a warrant based on *Jones*, a case involving officers of the same police department

investigating similar drug activity in the same area of Dallas.

More significantly, even indulging the government's version of the facts, Officer Verbal and

his fellow officers had ample opportunity to seek a search warrant but chose instead to confront the

suspect without justification.  There does not appear to have been any special urgency that would

have justified the knock and talk over pursuing a warrant.  There was no evidence that the

contraband was to be removed; the officers, including plainclothes officer Verbal, would not have

been placed into special danger while guarding the site while they sought a search warrant (Verbal

had already patrolled the premises for forty five minutes without incident); and there was no

indication that the defendant and his companion were aware of the DPD's surveillance, much less

that they were intending to destroy the evidence or flee the scene.[15]  *Cf. United States v. Rico*, 51

F.3d at 501 (listing five relevant factors to determining if exigency existed).

Accordingly, the Court finds that the "knock and talk" was an unreasonable investigatory

tactic under the circumstances since the Officer Verbal and the DPD had obtained, first-hand, more

than enough evidence to believe that drug sales were occurring in Apartment 204 for a search

warrant.  Consequently, any exigency that would have possibly resulted from the circumstances of

the knock and talk, as alleged by the government, would have been "manufactured."  Any other

result would eviscerate the warrant requirement.  Absent unusual or pressing circumstances, officers

who obviously have sufficient probable cause to obtain a search warrant cannot simply announce

---

[15] Officer Verbal's own testimony suggests that the occupants of the apartment were not aware of the DPD's surveillance and demonstrates that this would not have been a concern during the time necessary to procure a search warrant.  Officer Verbal had already patrolled the area for 45 minutes without incident, had repeatedly conferred with other officers and his supervisor, and had even left the scene to conduct a traffic stop.

their presence and suspicions at a suspect's home, only to forcibly enter the premises under the manufactured concern evidence may now be destroyed or that danger not justifies a warrantless entry.

### D.     Suppression:

The exclusionary rule requires that evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. *United States v. Calandra*, 414 U.S. 338, 347 (1974); *Mapp v. Ohio*, 367 U.S. 643 (1961); *Weeks v. United States*, 232 U.S. 383 (1914). This prohibition also applies to the fruits of the illegally seized evidence. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

The primary function of the exclusionary rule is to deter violations of the Fourth Amendment. *See Stone v. Powell*, 428 U.S. 465, 486 (1976); *United States v. Janis*, 428 U.S. 433, 446 (1976). The rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than [safeguard] a personal constitutional right of the party aggrieved." *Calandra*, 414 U.S. at 348. In other words, it "compel[s] respect for the [Fourth Amendment] in the only effectively available way– by removing the incentive to disregard it." *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

As mentioned previously, the Court credits the defendant's version of events over Officer Verbal's testimony. Unlike Officer Verbal, the defendant did not change his testimony at critical junctures and his demeanor remained constant and unfazed when asked to clarify small inconsistencies during cross examination. In light of the evidence introduced at the suppression hearing and controlling authority, the Court finds that Officer Verbal violated the Fourth

Amendment when, without justification, he pushed open a nearly shut door and "poked" his head through the doorway to see what lay inside.

The Court does not dispute that Officer Verbal and his fellow officers were acting with the best intentions of law enforcement.  But as one Fifth Circuit judge has recently noted, "the road to hell is paved with good intentions."  *Cf. Gould*, 364 F.3d at 605 (DeMoss, dissenting).  Although that statement is not the most cited rule of law in Fourth Amendment jurisprudence, it brings to mind Justice Jackson's famous words in *Johnson v. United States*, 333 U.S. 10 (1948) which were later resurrected in *Payton*:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Johnson*, 333 U.S. at 13-14; *accord, Payton*, 445 U.S. at 586 n.24.  This Court cannot excuse a tainted search just because it bore fruit.  "Not only do [Fourth Amendment opinions] reflect today's values by giving effect to people's reasonable expectations of privacy, they also shape future values by changing our experience and altering what we come to expect from our government."  *United States v. Kincade*, 379 F.3d 813, 873 (9th Cir. 2004) (Kozinski, dissenting) (citing Eugene Volokh, *The Mechanisms of the Slippery Slope*, 116 Harv.L.Rev. 1026, 1077-1114 (2003)).

## III. Conclusion

Because the Court resolves a factual dispute in the defendant's favor and concludes that

no exigent circumstances were present in this case, the defendant's motion is hereby

GRANTED.

It is so **ORDERED.**

**ENTERED:   September 14, 2005.**

_____
**JERRY BUCHMEYER**
**SENIOR UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**